IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 05, 2014

**IN RE AARON E.**

**Appeal from the Juvenile Court for Maury County**
**No. 86911      George L. Lovell, Judge**

_____

**No. M2014-00125-COA-R3-PT** - **Filed August 4, 2014**

_____

Angela E. ("Mother") appeals the termination of parental rights to her minor child, Aaron E. The Tennessee Department of Children's Services ("DCS") placed the child in protective custody based upon evidence of physical abuse. The abuse occurred while the child was in the care of Mother's boyfriend. The Juvenile Court later made a finding that the child was dependent and neglected and granted temporary custody to DCS. DCS ultimately filed a petition to terminate Mother's and the father's parental rights. The Juvenile Court terminated the father's parental rights at a separate hearing, and the matter proceeded to trial against Mother only. Following the trial, the Juvenile Court entered an order also terminating Mother's parental rights, relying on the grounds of abandonment and persistence of conditions. We have determined that the record contains clear and convincing evidence to support terminating Mother's parental rights on one of the two grounds relied upon by the Juvenile Court and to support the court's conclusion that terminating Mother's parental rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Seth M. Lasater, Columbia, Tennessee, for the appellant, Angela E.

Robert E. Cooper, Jr., Attorney General and Reporter, Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Late on the night of October 8, 2010, Mother returned to her apartment after work to find her ten-month-old son, Aaron E., unable to move his leg. Aaron and an older half-sibling had been in the care of Mother's boyfriend, who also lived in the apartment. Following a trip to the hospital, Aaron was diagnosed with a broken leg. He also had broken blood vessels in his eye and bruises to his ear and jaw. The care team at the hospital found the child's injuries inconsistent with the boyfriend's explanation of events and reported the matter to DCS as a case of physical abuse. On October 12, 2010, DCS filed a Petition for Temporary Legal Custody of Aaron and his half-sibling.[1] On December 7, 2010, the Juvenile Court for Maury County found Aaron to be dependent and neglected and granted DCS temporary custody of the child. The Juvenile Court's order also ratified a permanency plan and directed the parents to follow the plan.

### A. The Permanency Plan

The permanency plan was a product of a meeting between Mother and the father, on the one hand, and Teresa Taylor, a family service worker, on the other. The stated goal of the permanency plan was returning the child to Mother. As conditions contributing to the placement of the child in state custody, the plan listed Mother's reaction to her child's injuries[2] and concern over her ability to select proper caretakers. The plan also identified Mother's inability to recognize the warning signs of possible abuse and the lack of a support system as conditions that prevented the child from leaving state custody.

In terms of needs and concerns related to the safety, well-being, and permanence, the plan identified several actions steps and desired outcomes relative to Mother. On the issue of supervision, the goal was for Mother to have daycare and appropriate caretakers she could trust with her child. For the future well-being of her child, the goal was for Aaron's medical and nutritional needs to be met. On the issue of permanence, the goal was for Mother to have a plan for transportation, as she did not have a means of transportation at the time.

---

[1] This appeal only pertains to Mother's parental rights to Aaron, so further information regarding his half-sibling is omitted.

[2] According to the petition for temporary legal custody, Mother, despite evidence to the contrary, expressed disbelief that her boyfriend would hurt Aaron, and Mother did not express any anger or resentment toward her boyfriend.

## B. The Trial Home Placement

Although the target date in the permanency plan for returning the child to Mother was February 3, 2011, at some later date not specified in the record, DCS petitioned for a trial home placement for Aaron. Since the removal of the child, Mother had been steadily employed, had gotten a car, and her residential situation appeared stable. On June 20, 2011, over eight months after the child was placed into DCS's custody, the Juvenile Court approved the trial home placement, relieving DCS of temporary custody of Aaron and granting custody to Mother effective as of June 27, 2011. Although the order granting the trial home placement does not specify, later pleadings indicate that the trial period was to last ninety days.

The trial home placement did not go well. Mother fell behind in paying her rent, and her ability to pay for childcare was a concern. The child's Guardian ad Litem, with the support of DCS, petitioned for a sixty-day extension of the trial home visit in the hope that Mother's financial situation would stabilize during the extended trial period. The Juvenile Court granted the extension, but then on November 10, 2011, DCS petitioned to revoke the trial home placement because Mother had lost her job. DCS also alleged that it had "attempted to aid [Mother] with regard to housing, child care, and budgeting, but the mother has not made the necessary efforts." The Juvenile Court revoked the trial home placement pending a hearing scheduled for November 21, 2011. Mother ultimately waived the hearing, and Aaron continued in the physical custody of DCS.

Despite Mother losing her job and her difficulties in budgeting, DCS petitioned for child support from Mother. The Juvenile Court set support at $285 per month to commence on January 1, 2012. The child support worksheet dated December 19, 2011, which was attached to the Order Setting Support, indicated Mother's monthly gross income to be $1,256.66. The record does not reveal the source of Mother's income. Although the permanency plan had provided that the father would pay support to Mother of $230 per month, the monthly support payments would not account for the incongruity of an unemployed mother with monthly gross income of $1,256.66.

From January 1, 2012, to July 1, 2012, Mother failed to make any child support payments. On June 27, 2012, DCS filed a Petition to Terminate Parental Rights against both Mother and the father. By this point, the father's whereabouts were unknown, and the Juvenile Court terminated the father's parental rights at a separate hearing. The matter proceeded to trial without a jury on the grounds of Mother's abandonment by failure to support and persistence of conditions. DCS also alleged that termination of Mother's parental rights was in the child's best interests.

## C. The Termination Proceeding

The Juvenile Court conducted a one-day trial on November 15, 2013. In support of its petition, DCS presented four witnesses, including Ms. Taylor, who was the family services worker for Aaron from the date he entered DCS's custody until March 31, 2012. Ms. Taylor was the only witness who had any involvement in the case prior to the filing of the petition for termination. In opposition to the petition, Mother offered her own testimony. Following closing arguments, the trial court ruled from the bench in favor of DCS.

On December 31, 2013, the trial court entered an order terminating Mother's parental rights. As grounds for termination, the Juvenile Court found that (1) Mother had "willfully failed to support or make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the filing of [the] petition" and "[Mother] was willfully unemployed from November 2011 until sometime in late April/early May 2012" and that (2) Mother "ha[d] not remedied the conditions that [led] to the removal, or other conditions persist pursuant to Tenn. Code Ann. § 36-1-113(g)(3)." The Juvenile Court also found termination of parental rights to be in the child's best interest.

## II. STANDARDS FOR REVIEWING PARENTAL TERMINATION ORDERS

Termination of parental rights is one of the most serious decisions courts make. As noted by the United States Supreme Court, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1) (Supp. 2013).

A parent has a fundamental right, based in both the federal and State constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While this right is fundamental, it is not absolute. The State may interfere with parental rights through judicial action in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only

where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence that at least one of the statutory grounds for termination exists and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved, *see Santosky*, 455 U.S. at 769, and its purpose "is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see also In re Angela E.*, 303 S.W.3d at 250; *In re M.W.A.*, 980 S.W.2d at 622. "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). The party seeking termination has the burden of proof. *Id*.

Appellate courts first review the trial court's findings of fact in termination proceedings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Next, "[i]n light of the heightened burden of proof in [termination] proceedings . . . the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97.

Mother's issues on appeal are whether the trial court erred in its findings that: (1) termination of Mother's parental rights was warranted under the grounds set forth in Tennessee Code Annotated section 36-1-113; and (2) termination of Mother's parental rights was in the child's best interest.

### III. GROUNDS FOR TERMINATING MOTHER'S PARENTAL RIGHTS

#### A. Abandonment

Mother argues that the Juvenile Court erred in its finding that she had abandoned Aaron pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i) through a willful

failure to support him for the four months preceding the filing of the petition for termination of parental rights. Her initial argument is that DCS failed to prove that no support payments were made by Mother during the applicable time period. She next argues that, even if DCS proved a failure to pay, any failure was not willful within the meaning of the statute. Whether a parent failed to visit or pay child support is a question of fact. *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). Whether such failure to visit or pay is willful is a question of law. *Id.*

### 1. Evidence of Non-payment of Child Support

At the trial, DCS introduced two documents titled "TN GOV-Department of Human Services, Child Support Enforcement Services, Non-Custodial Parent Payment Summary Printable Version." The first is a record of payments from January 1, 2012, to July 1, 2012, showing $0.00 in payments from Mother. The second document covers the period from August 1, 1995, to November 2, 2013. This document also reflects that no payments were made from January 1, 2012, to July 1, 2012. The first payment reflected was made on July 17, 2012, in the amount of $60.00. From that point through November 2, 2013, payments totaling $4,132 were received. The Juvenile Court admitted both documents into evidence under Tennessee Code Annotated section 24-7-121(a), which provides as follows:

> (a)(1)(A) The department of human services child support payment records shall be the official records for all payments which have been appropriately sent to the central collection and distribution unit pursuant to § 36-5-116.
>
> (B) Notwithstanding any other law or rule of evidence to the contrary, a computer printout or copy, by telecopier facsimile or otherwise, an electronic mail copy or copy obtained by way of Internet access, of the child support payment screen which is generated from the Tennessee child support enforcement system (TCSES) operated by the department or its contractors, shall be admitted into evidence as a non-hearsay, self-authenticating document in all judicial and administrative proceedings without the need for certification by a records custodian.
>
> (2) No conclusive presumption of correctness shall attach to such record following admission, but the record shall constitute prima facie evidence of its correctness and shall be subject to rebuttal by alternative or conflicting documentary evidence of payment of the support obligation.

Tenn. Code Ann. § 24-7-121(a) (2000).

At trial, Mother objected to the introduction of the documents on the basis that they constituted hearsay. On appeal, she argues that, because a parental termination action has a "higher clear and convincing evidence standard," this Court should "pay close heed to the limiting language . . . that no conclusive presumption of correctness attaches" to the documents. This argument is without merit. As provided by the statute, the documents introduced are self-authenticating and, for that reason, are considered non-hearsay. Tenn. Code Ann. § 24-7-121(a)(1)(B). Consequently, the Juvenile Court properly overruled the hearsay objection.

Once admitted, the documents "constitute[d] prima facie evidence" of Mother's failure to pay support. Tenn. Code Ann. § 24-7-121(a)(2). The burden then fell on Mother to rebut the evidence "by alternative or conflicting documentary evidence of payment of the support obligation." *Id.* Mother presented no evidence of payment of support for the time period in question. Therefore, the trial court properly found that Mother had failed to pay support during the four-month period proceeding the filing of the petition to terminate parental rights.

## 2. Willfulness of Non-payment of Child Support

Failure to pay support does not lead to termination of parental rights unless the failure is found to be willful. The willfulness requirement is constitutional as well as statutory. *See In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). In *In re Audrey S.*, we addressed in some detail the meaning of the term "willfulness":

> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so . . . .
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly,

triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (internal citations omitted). As noted, the financial ability, or capacity, of the parent to pay support must be considered in determining willfulness. If a parent's failure to pay is due to financial inability, the parent is not willfully failing to support. *See Pierce v. Bechtold*, 448 S.W.2d 425, 429 (Tenn. Ct. App. 1969).

In this case, the capacity of Mother to pay child support during the entire four-month period preceding the petition to terminate parental rights, which ran from February 27, 2012, through June 27, 2012, is in question. The trial court found that Mother was unemployed from November of 2011 until "late April/early May of 2012." We have found a failure to pay support during a period of unemployment was willful. For instance, when a parent is able to work but not "actively pursuing steady work or any other source of legal income" during the period of unemployment, the failure to pay support can be willful. *See e.g. In re Jacob A.G.*, No. E2012-01213-COA-R3-PT, 2013 WL 357573, at *5-6 (Tenn. Ct. App. Jan. 30, 2013) (finding willfulness where parent had not worked while her children were in state custody and the only evidence that parent sought employment was "her testimony that she submitted applications at 'all the different places around town.'")

Although the record contains either scant or no evidence regarding important factors that bear upon capacity, such as Mother's employability, earning history, assets, or disposable income, the record amply shows Mother's willingness to work. The permanency plan listed Mother's employment as a "strength indicator," and she did have steady employment for a significant period while Aaron was in the custody of DCS. According to Ms. Taylor, one of the reasons DCS petitioned for a trial home placement was that Mother had "maintained her job for almost a year."

Once Mother lost her job, the testimony concerning Mother's efforts to find work was contradictory. Ms. Taylor testified that Mother did not avail herself of Ms. Taylor's assistance in finding a job and that Mother was concentrating on finding housing rather than seeking employment. The foster mother testified that she alerted Mother to "six to seven" jobs advertised in the local newspaper but Mother never followed up with the jobs. Mother testified that she did apply for jobs and had even secured a job that she was unable to accept due the distance from her home.

Rather than credit Ms. Taylor or the foster mother's testimony over that of the Mother, the trial court found wilfulness based solely upon Mother's job status at a Shell gas station ("Shell") where she worked as a clerk. The Juvenile Court found in pertinent part as follows:

According to the proof, the Court further finds that [Mother] was willfully unemployed from November 2011 until sometime in late April/early May 2012. [Mother] had been gainfully employed at Shell for a significant period of time. Based on the testimony, [Mother] was sent home from work by her supervisor at Shell in November 2011 and she either stopped showing up thereafter because she thought she had been terminated or was terminated. According to her account of the incident, FSW Taylor counseled [Mother] that she may have mistakenly concluded that she had been terminated and encouraged her to contact her supervisor immediately regarding the status of her employment. FSW Taylor testified that [Mother] failed to heed her advice and did not speak with her supervisor.

[Mother's] account of this incident varies slightly from that of FSW Taylor and is contradictory. [Mother] first testified that she did heed FSW Taylor's advice and that she made several attempts to call her supervisor, but that her calls were not returned. [Mother] later testified that she was so disillusioned with her supervisor that there was no way she would have even considered returning to her employment at Shell while that individual remained in his or her position.

. . . .

Based on the evidence, the Court finds it is unlikely that [Mother] made any attempts to contact her supervisor at Shell after being sent home in November of 2011. By her own admission, the only reason [Mother] decided to go back to work at Shell was because she found out that the supervisor had left. As such, it is clear to the Court that [Mother] was not interested in retaining or preserving her employment at Shell after the November 2011 incident because she did not want to work with her supervisor.

[Mother]'s return to work at Shell in late April/early May of 2012 indicates to the Court that the only one preventing [Mother]'s return to gainful employment at Shell in the months after the November 2011 incident was [Mother]. As such, the Court finds that [Mother] was willfully unemployed from the time she left her employment at Shell in November of 2011 until her return to her employment at Shell sometime in late April/early May of 2012. [Mother] was employed for at least one month during the four months at issue for this TPR and did not pay any child support during that period.

Willful unemployment can equate to a willful failure to support. *See In re Austin D.*,

No. E2012-00579-COA-R3-PT, 2013 WL 357605, at *11-12 (Tenn. Ct. App. Jan. 30, 2013) (mother's personal choice not to work contributed to the conclusion that she willfully failed to pay child support).

For her part, Mother disputed that she voluntarily left her job, testifying that she was fired from Shell. DCS did not offer contrary proof, rather Ms. Taylor offered an opinion that Mother may have incorrectly assumed she was fired or that Mother could have regained her job by calling her boss. The trial court reasoned that Mother must have been able to return to work at any time after her firing or departure from Shell based on Ms. Taylor's opinion; Mother's admitted conflict with her supervisor at Shell; doubts that Mother attempted to call her employer about her job status; and the fact that Mother ultimately returned to work for Shell several months later. However, this finding could only be based on speculation as no one from Shell was called to testify, and Ms. Taylor testified that she had not contacted anyone at Shell. Speculation is not clear and convincing evidence. *See In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *12 (Tenn. Ct. App. Aug. 3, 2005). Therefore, we are left only with Mother's testimony that she was fired.

In light of the foregoing, we cannot say that clear and convincing evidence establishes that Mother willfully failed to fulfill her child support obligation during all four months immediately preceding the June 27, 2012 petition to terminate parental rights. DCS failed to carry its burden of proof on this ground for termination.

## B. Persistence of Conditions

Mother also argues that the Juvenile Court erred in its reliance upon Tennessee Code Annotated section 36-1-113(g)(3) as a ground for termination of Mother's parental rights. Because Aaron was originally placed in state custody due to physical abuse perpetrated by her former boyfriend and that relationship ended with the boyfriend's imprisonment, Mother submits that she remedied the conditions that led to the child's removal. Mother claims that other conditions identified by DCS, beyond those that led to the child's removal, were properly addressed and did not persist as of the filing of the petition for termination of parental rights.

Under Tennessee Code Annotated section 36-1-113(g)(3), parental rights may be terminated where:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A) The conditions that led to the child's removal or other conditions

-10-

that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3). This ground for termination of parental rights is commonly referred to as "persistence of conditions." *In re Audrey S.*, 182 S.W.3d at 871.

The goal of the persistence of conditions ground is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate his or her ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010). Persistence of conditions focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874. The question before the court is "the likelihood that the child can be safely returned to the custody of the mother, not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

Each of the statutory elements that make up the ground known as persistence of conditions must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d 539, 550 (Tenn. 2002). Mother's appeal implicates the second and third elements, whether "[t]he conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect . . . still persist" and whether "[t]here is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future." Tenn. Code Ann. § 36-1-113(g)(3)(A), (B). We address each in turn.

**1. Conditions that Led to Removal or that Could Lead to Further Abuse or Neglect**

In the petition for termination of parental rights, DCS alleged the existence of the following conditions for the purposes of Tennessee Code Annotated section 36-1-113(g)(3)(A):

The Department removed the child from his home because of [Mother's] inability to determine appropriate caregivers for her child, resulting in the child's broken leg. The conditions that led to removal still persist.

Other conditions exist in the home that, in all reasonable probability, would subject the child to further abuse and neglect and which, therefore, prevent the child's return to the care of [Mother]. [Mother] does not have suitable housing for the child or employment sufficient to provide for the child's needs. [Mother] has been willfully unemployed since November 2011. Further, [Mother] does not have a stable residence. The child was placed on a Trial Home Visit with [Mother] from June to November 2011. The Trial Home Visit was revoked because [Mother] was not providing proper care for the child. [Mother] had lost her job, was behind on rent and facing eviction. [Mother] was not providing proper medical care for the child. [Mother] did not have the ability to make arrangement for the child, such as pick up from daycare, without the assistance of DCS.

The trial court found that Mother's issues with "employment, housing, transportation and the provision for the child's basic necessities" were conditions that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect.

After reviewing the record, we conclude that the evidence does not preponderate against the trial court's findings. During the trial home placement and at the time the petition for termination was filed, Mother was attempting to support both herself and her child based on a minimum wage job. She acknowledged that, during that period of time and afterward, she needed better housing. Her later changes of residence were motivated by an admirable, but ultimately vain, attempt to find someone to help defray housing costs. Although she had acquired a vehicle since the ratification of the permanency plan, the vehicle was apparently unreliable. Mother often relied on Ms. Taylor or Aaron's foster parents for transportation. Due to her work schedule and lack of transportation, she had to rely on others to pick up Aaron or watch Aaron when he was sick and could not stay in daycare. Mother's responses to her financial situation, seeking someone to defray housing costs and needing assistance with childcare, contributed, at least in part, to Mother's decision to place Aaron in the care of an individual who caused serious injury to her child.

## 2. Likelihood of Remediation of Conditions to Permit Return to Parent

Having found the presence of persistent conditions with a reasonable probability of causing the child to be subjected to further abuse or neglect, the trial court is required to consider the likelihood that the conditions will be remedied such that the child can be safely

returned to the parent in the near future. Tenn. Code Ann. § 36-1-113(g)(3)(B). The likelihood of any condition being remedied is generally dependent on the efforts of both the parent or guardian and DCS, which is statutorily required to use "reasonable efforts" to "[m]ake it possible for the child to return home." Tenn. Code Ann. § 37-1-166(a)(2); *see In re Giorgianna H*., 205 S.W.3d 508, 518-19 (Tenn. Ct. App. 2006).

Mother does not challenge the reasonableness of DCS's efforts to reunify her with Aaron, but based upon the record, Mother did not always avail herself of all of the assistance and support being offered by or through DCS. For instance, early in the process Mother declined to accept mental health treatment, despite an apparent need. Later, after the petition for termination was filed, Mother had the opportunity to attend mental health sessions, but the sessions did not proceed after she missed the first two appointments.

Irrespective of her efforts, Mother contends that all of the persistent conditions were ultimately remedied, but even if accurate, the remedies did not come at "an early date," which basically precluded return of Aaron to his Mother "in the near future." Tenn. Code Ann. § 36-1-113(g)(3)(B). Most of the conditions found by the trial court had existed since at least November of 2011,[3] when Mother was fired from her position with Shell, and these issues remained several months after the filing of the petition for termination. Mother also concedes that she would require further assistance, assistance that she may not be able to accept because of her long hours at work.

We conclude that the trial court did not err in terminating Mother's parental rights based upon the ground of persistence of conditions.

### III. BEST INTERESTS OF AARON E.

Mother's final argument is that the evidence did not clearly and convincingly demonstrate that it was in Aaron's best interest for Mother's parental rights to be terminated. Termination of parental rights must be based upon the existence of at least one statutory ground and proof that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c). The focus of the best interest analysis is on what is best for the child, not what is best

---

[3] In finding persistent conditions, the trial court erroneously noted that the issues of "employment, housing, transportation and the provision for the child's basic necessities existed at [the] time [Aaron was placed in DCS custody,] were identified as barriers to reunification and were addressed within the initial permanency plan." However, the evidence preponderates against such a broad statement. The permanency plan makes no reference to Mother's employment and housing situation. If employment or housing had been barriers to reunification at the time of the child's initial removal, Ms. Taylor could not have testified as she did that Mother's employment "for almost a year" and maintenance of "the same residence" influenced DCS's decision to petition for a trial home placement sometime prior to June 20, 2011.

for the parent. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Courts consider the following statutory factors in making a best interest analysis:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). Not every factor enumerated in the statute applies to every case because the facts of each case can vary widely. *In re William T.H.*, No. M2013-00448-COA-R3-PT, 2014 WL 644730, at *4 (Tenn. Ct. App. Feb. 18, 2014).

The trial court based its decision on factors (1), (2), and (5) of Tennessee Code Annotated section 36-1-113(i). With respect to Aaron's best interest, the Juvenile Court concluded as follows:

> The Court finds that it is in the best interest of the child to terminate the parental rights of [Mother] because she has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home. [Mother]'s continued and persistent problems with maintaining steady employment, housing, transportation and care for the child, despite the significant efforts of DCS to assist her with the same, placed the child at significant risk of abuse, neglect or harm while in her care.

> The Court also finds that it is in the best interest of the child to terminate the parental rights of [Mother] because a change of caretakers and physical environment resulting from a return to [Mother] is likely to have a detrimental/negative effect on the child's emotional, psychological and medical condition.

Although the evidence preponderates against the factual finding that Mother's employment was not "steady," the other findings of the trial court are properly supported. Mother was compelled to leave her apartment during the trial home visit due to falling behind in rent payment. In an effort to stabilize her finances, she lived in a few different residences, some of which were unsuited to raising a child. At one point, Mother even refused to allow DCS to visit her residence or to tell DCS where her residence was located. Mother's vehicle proved to be unreliable, and she frequently had to rely on others for transportation when her destination was outside of walking distance. Because she was a single parent and compelled to work, Mother was reliant on daycare. DCS paid for daycare during the trial home placement or watched the child when he could not stay in daycare. Mother's finances prevented her from arranging for daycare without assistance.

In regards to the effect a change of caretakers and physical environment would have on the child's emotional, psychological and medical condition, DCS presented the testimony of a licensed clinical social worker. The social worker completed an extensive evaluation of the relationship between Aaron and Mother and Aaron and the foster mother. When asked her opinion on the effect of a change, she testified as follows:

-15-

The risks if Aaron leaves the home of the [foster parents] right now would be as follows: He would experience significant grief and loss regarding the lack of contact with not only [foster mother] and [foster father] and the other children in that home. As of right now he -- as of my last contact with him in June he certainly related to them as his family, as his mother, his father. So we could substantiate that he would have significant grief and loss regarding the lack of relationship.

Also another risk would be the lack of stability if reunited with his [M]other. As of my last contact her housing and employment and transportation and ability to come to various meetings that Aaron needed was definitely compromised. She was -- you know, had commented that of those things were in need.

Also a risk if he is removed from the [foster] family would be that he would be left with this anxious-ambivalent attachment style[4] that in terms of the way that he relates to his [M]other, that style causes difficulty in not only that relationship but in future relationships.

(footnote added). The social worker also noted the potential for developmental regression.

For these reasons, we conclude that there is clear and convincing evidence that it is in the child's best interest to terminate Mother's parental rights.

## IV. CONCLUSION

The Juvenile Court's judgment terminating Mother's parental rights to Aaron E. is affirmed. Costs of this appeal shall be taxed to the appellant, Angela E., for which execution may issue, if necessary.

_____
W. NEAL McBRAYER, JUDGE

_____

[4]The social worker described the attachment between Aaron and Mother as "anxious-ambivalent" where as the attachment between the child and the foster mother was described as "secure." The social worker described the "anxious-ambivalent" attachment as problematic because the child is unsure, unclear, and unsteady.